## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA

          Plaintiff,                         Case No. 05-20118-JWL

v.

DONALD WATKINS,
        a/k/a "Donny Ray",

          Defendant.

## MEMORANDUM AND ORDER

Defendant Donald Watkins was charged in a one-count indictment on November 11, 2005, with knowingly and intentionally possessing with the intent to distribute 500 grams or more of cocaine. This matter comes before the court on his motion to suppress the cocaine and currency seized from his vehicle on October 26, 2005, by Kansas City, Kansas, police officers. For the reasons explained below, his motion to suppress (doc. 11) is denied.

## Background

On February 28, 2006, the court held a hearing on Mr. Watkins's motion to suppress. Counsel for the parties engaged in oral argument before the court, and two witnesses, both officers of the Kansas City, Kansas Police Department, testified for the government: (1) Eric Jones, a DEA Task Force Officer; and (2) Patrick Callahan, a canine officer.

The testimony of Officer Jones revealed that on October 21, 2005, he received a tip from an undisclosed information source that Mr. Watkins had traveled from Texas to Kansas

1

City to sell cocaine.  Mr. Watkins already was well-known by the Kansas City area police, and also by Officer Jones, to be a multi-kilogram dealer who sold cocaine in the Kansas City and Wichita areas.

Four days later, on October 25, 2005, Officer Jones received more information regarding Mr. Watkins's drug dealing plans in Kansas.  He was informed that Mr. Watkins would likely be at 4602 Haskell in Kansas City, Kansas, that day with bricks of cocaine and a substantial amount of cash.  The tip included the accurate color and description of Mr. Watkins's vehicle, a black Ford F-150 pick-up truck.  Testing the validity of the information provided, Officer Jones testified that he and other officers traveled to 4602 Haskell that day, where they observed a black Ford F-150 pick-up truck matching the description they received. They observed the truck backed halfway into the garage at that address, with a person who later was identified as Mr. Watkins standing next to it and reaching into the bed of the truck.  They also observed and recorded the Texas license plate number of the vehicle.

Officer Jones testified that other Kansas City police officers then followed the pick-up truck as it headed toward an apartment building, where they observed Mr. Watkins drive into a parking lot and stop.  Another officer present at the scene, Officer Pam Bennett, relayed to Officer Jones that after Mr. Watkins talked on his cell phone for probably ten minutes another vehicle pulled alongside Mr. Watkins's truck.  She notified Officer Jones that a man exited the other vehicle and approached the passenger window of Mr. Watkins's truck, which was down, took a bag or something. from Mr. Watkins's truck and took it to an apartment.

Officer Jones testified that he then resumed his surveillance and once again followed

Mr. Watkins's vehicle.  He testified that he observed Mr. Watkins make a lane change without signaling, a traffic violation under Kansas law.  At that point, Officer Jones radioed Officer Callahan, who was nearby in a marked police car to pull over and cite Mr. Watkins for the improper lane change.

Officer Callahan testified that he promptly responded to Officer Jones's request for assistance.   Officer Callahan is a canine officer with the Kansas City, Kansas Police Department, and in this capacity, he travels with his canine in his vehicle.  Upon receiving the description and license plate number of Mr. Watkins's vehicle, Officer Callahan pursued and pulled over Mr. Watkins at around 6:50 P.M. at the intersection of 78th Street and Interstate 70 in Kansas City, Kansas.  He then approached the vehicle and obtained Mr. Watkins's driver's license and insurance information.   Following a computer check with the police dispatcher, Officer Callahan discovered that Mr. Watkins had produced an invalid Texas driver's license.

After receiving this information, Officer Callahan re-approached Mr. Watkins and asked him to step out of his vehicle.   At that point, he testified that he asked Mr. Watkins for permission to do a canine sniff of the exterior of his vehicle, and he testified that Mr. Watkins orally consented.   Thus, at approximately 7:00 P.M., ten minutes after he pulled over Mr. Watkins's vehicle, Officer Callahan had his canine sniff the exterior of Mr. Watkins's vehicle. He testified that his canine alerted that drugs were present near the rear tailgate or truck bed of the vehicle.

Following this positive canine alert, Officer Callahan contacted his sergeant.  By that point, other officers had arrived and were talking to Mr. Watkins.  Officer Callahan testified

3

that the officers present then obtained verbal consent from Mr. Watkins to search the interior of the vehicle, as long as they did not "tear up" anything.  In addition to inspecting the cab of the truck, the officers inspected the truck bed.

Officer Jones, who participated in the search, testified that based on his experience it was obvious that someone had tampered with the truck bed liner and bolts.  He testified in part that he noticed non-factory screws had been installed throughout the truck bed, and that he suspected a false compartment might have been installed somewhere near the truck bed.  He also testified that he noticed a fresh hand or thumb print in the dust, which further raised his suspicions.

Throughout this time, Officer Jones testified that he informed Mr. Watkins that he was not under arrest and that he did not have to remain at the scene while they inspected his vehicle.  Officer Jones testified that the officers towed Mr. Watkins's vehicle to storage and impounded it overnight.  They then obtained a search warrant the next day, October 26, 2005, which they executed after Officer Callahan's canine once again alerted to the presence of contraband in the rear tailgate.  Ultimately, the October 26 search of the vehicle revealed a hidden compartment under the truck bed, where the officers discovered nearly five kilograms of cocaine and two vacuum-sealed plastic packages of currency totaling roughly $33,900.

Mr. Watkins's motion to suppress challenges the events leading up to the October 26, 2005, search, beginning with the initial traffic stop by Officer Callahan at 6:50 P.M. on October 25, 2005.

## Analysis

4

The Fourth Amendment prohibits unreasonable searches and seizures by the Government.   U.S. Const. amend. IV.   "Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)." *Id.*

Under *Terry*, the first inquiry "is whether the stop was justified at its inception. '[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"   *Id.* at 1206 (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (en banc)).   *See also United States v. Gregoire*, 425 F.3d 872, 876-79 (10th Cir. 2005) ("An observed traffic violation or a reasonable suspicion of such a violation under state law plainly justifies a stop.").

At the hearing for this motion, counsel for Mr. Watkins asserted that Officer Callahan did not have reasonable suspicion of the invalid lane change because he did not directly observe the traffic violation.[1]   His challenge fails, however, because Officer Jones, who directly observed the improper lane change, immediately radioed to Officer Callahan that Mr. Watkins

---

[1] The specific traffic violation at issue is codified in K.S.A. 8-1548(a), which provides in part: "No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided." *Id. See also United States v. Sanchez-Vela*, 2005 WL 3068333, *3 (D. Kan. 2005) (interpreting and applying the improper lane change violation).

had committed the traffic violation.  This is sufficient to form reasonable suspicion, as the Tenth Circuit has explicitly opined: "To the extent the [defendant argues] that one officer may not rely on another officer's reasonable suspicion when conducting a traffic stop, we now reject this argument.  We have specifically held that police officers are entitled to rely upon information relayed to them by other officers in determining whether reasonable suspicion exists to justify an investigative detention." *United States v. Mullane*, 123 Fed. Appx. 877, 878-79 (10th Cir. 2005) (citing *Oliver v. Woods*, 209 F.3d 1179, 1190-91 (10th Cir. 2000); *United States v. Hensley*, 469 U.S. 221, 232 (1985)).  Additionally, the police may aggregate their "collective knowledge" to form reasonable suspicion.  *See United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003) ("In determining reasonable suspicion [we] 'look to the knowledge of all the police involved in this criminal investigation, since probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest.'" (quoting *United States v. Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982)).  Thus, the government satisfies the first inquiry under *Terry*.

"The second *Terry* inquiry is whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop." *Williams*, 403 F.3d at 1206 (citing *Terry*, 392 U.S. at 20).  In making this assessment, "[a]n officer may detain a motorist for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." *Id.*

The court will first analyze whether Mr. Watkins consented to be briefly detained to

6

allow the initial canine sniff of the exterior of his vehicle.[2]   In examining the issue of consent, the Circuit has advised that "[v]alid consent is that which is 'freely and voluntarily given.' Whether a defendant freely and voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances."   *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal citations omitted).   To establish that Mr. Watkins gave valid consent, the government must: "(1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given; and (2) prove that this consent was given without implied or express duress or coercion." *Id.*

The only evidence regarding consent was offered through the testimony of Officer Callahan, who stated that Mr. Watkins quickly gave consent after he was informed that his Texas driver's license was invalid.   In the absence of any contrary evidence or testimony, the court finds that Mr. Watkins freely consented to being detained long enough to allow the canine sniff of the exterior of his vehicle, particularly because Officer Callahan's testimony was entirely credible.

Ordinarily, a driver who is detained for a traffic violation is not deemed to have consented to further questioning unrelated to the traffic stop until his or her driver's license and registration have been returned.   *See, e.g., United States v. Mendez*, 118 F.3d 1426, 1429-30 (10th Cir. 1997).   Here, however, Mr. Watkins presented an invalid driver's license, which

---

[2] What Mr. Watkins consented to was not a "search", as that term is used within the meaning of the Fourth Amendment, because it is axiomatic that a canine sniff performed on the exterior of a defendant's car while the defendant is lawfully seized for a traffic violation is not a search. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

7

means that after the traffic stop was completed, he could no longer drive, nor did he have a passenger with him who could drive his vehicle. Thus, Mr. Watkins probably was not being detained by Officer Callahan during the canine sniff, as he had no ride or means of transportation to leave the roadside at that point, and Officer Callahan essentially received consent to conduct a canine sniff on the exterior of an abandoned vehicle. In any event, the court finds that Mr. Watkins consented to the canine sniff of the exterior of his vehicle at 7:00 P.M. on October 25, 2005, regardless of whether he was detained at that point.

In an abundance of caution, the court next will analyze the alternative, second possible justification under *Terry*: whether Officer Callahan had "an objectively reasonable and articulable suspicion that illegal activity has occurred." *Williams*, 403 F.3d at 1206 (citing *Terry*, 392 U.S. at 20). The following articulable reasons support the government's contention that Officer Callahan had reasonable suspicion for conducting the canine sniff:

(1)     The Kansas City police in general and Officer Jones in particular had extensive prior knowledge that Mr. Watkins was a multi-kilogram drug dealer who traveled from Texas to sell cocaine in Wichita and Kansas City.

(2)     The surrounding circumstances corroborated the tip from the undisclosed source. Mr. Watkins's black F-150 truck was found suspiciously parked at the exact address in Kansas City, two states away from Texas, exactly when and where the tip suggested it would be.

(3)     The officers observed an unidentified man suspiciously carry a bag from Mr. Watkins's truck to an apartment residence after Mr. Watkins had stopped and conducted a cell phone conversation.

(4)     Mr. Watkins presented Officer Callahan an invalid Texas driver's license.

Mr. Watkins contends that none of these factors is sufficient to create reasonable

suspicion, but taken together, these factors certainly combine to form reasonable suspicion under the "the totality of the circumstances" test:

> [The defendant] argues that, when viewed one-by-one, the factors did not give rise to reasonable suspicion. The Supreme Court has expressly rejected this sort of "divide-and-conquer" analysis; a court may not evaluate and reject each factor in isolation. When determining whether there was reasonable suspicion, a court must look to the "totality of the circumstances" to see whether the officer had a "particularized and objective basis for suspecting legal wrongdoing."

> The fact that [the defendant] offered explanations for the suspicious circumstances is immaterial. A law enforcement officer may rely upon his training and experience without inquiring of a defendant as to innocent explanations. A court should accord deference to an officer's ability to distinguish between innocent and suspicious actions.

*Williams*, 403 F.3d at 1207 (internal citations omitted).

On nearly all the issues pertaining to this motion, the Tenth Circuit's decision in *Williams* is controlling. Facing almost the same factual pattern, the Circuit opined: "During the lawful detention, [the] Trooper retrieved a trained canine from his police car and conducted a canine search on the exterior of [the defendant's] vehicle. A canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests. The canine alerted to the presence of drugs in the vehicle. A canine alert gives rise to probable cause to search a vehicle." *Id.* at 1207. Moreover, it is entirely proper that the officers towed and impounded the vehicle once the canine sniff established probable cause. *See United States v. Hunnicutt*, 135 F.3d 1345, 1351 (10th Cir. 1998) ("the officers properly impounded the vehicle to later search it based on probable cause"); *United States v. Anderson,* 114 F.3d 1059, 1065-66 (10th Cir. 1997) (same).

Finally, the court finds that Mr. Watkins was not unreasonably delayed between the time

9

of the stop (6:50 P.M.) and the time of the canine sniff (7:00 P.M.). Officer Callahan's canine was with him in his police car from the inception of the stop, and the ten minute gap falls far within even the most limited time frame deemed "reasonable" by the Tenth Circuit. For instance, in *United States v. Sieren*, the Circuit explained: "Based upon the totality of the circumstances, we agree with the district court that [the officer] possessed the requisite reasonable suspicion to detain [the defendant]. The detention was brief as no more than twenty minutes elapsed from the time of the initial stop to the time the drug detection dog alerted to the drugs in the vehicle." 68 Fed. Appx. 902, 2003 WL 21419744 (10th Cir. 2003). *See also United States v. Rosborough*, 366 F.3d 1145, 1147-48 (10th Cir. 2004) (45-minute delay deemed reasonable)*; United States v. Cervine*, 347 F.3d 865, 872 (10th Cir. 2003) (50-minute delay deemed reasonable); *United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001) (15-minute deemed reasonable); *United States v. Villa-Chaparro,* 115 F.3d 797, 802-03 (10th Cir.1997) (38-minute delay deemed reasonable).

## Conclusion

For all of the above reasons, the court denies Mr. Watkins's motion to suppress the evidence seized during the search of his vehicle on October 26, 2005 (and the events on October 25, 2005, leading up to that search). The court finds that any continued detention of Mr. Watkins regarding matters unrelated to the traffic stop was not an unreasonable seizure under the Fourth Amendment. The court also finds that any continued detention of Mr. Watkins pending Officer Callahan's canine sniff was not an unreasonable seizure. The court also concludes that the search of Mr. Watkins's vehicle after the positive canine alert was

supported by probable cause, and therefore it was reasonable.  In sum, "[b]ecause the stop and detention were based upon reasonable suspicion, and the canine sniff provided probable cause for the search, they did not violate the Fourth Amendment." *Williams*, 403 F.3d 1207.

**IT IS THEREFORE ORDERED BY THE COURT** that Mr. Watkins's motion to suppress (doc. 11) is denied.

**IT IS SO ORDERED** this 24th  day of March, 2006.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge